RECEIVED
APR 19 2010
U.S.D.C. S.D. N.Y.
CASHIERS

DS_Complaint4.doc

Carl E. Person
Attorney for Plaintiff
325 W. 45th Street – Suite 201
New York NY  10036-3803
Telephone:   (212) 307-4444
Facsimile:   (212) 307-0247
Carlpers2@gmail.com

JUDGE MARRERO

10 CV 3281

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

DEBORAH SLATZER,

                             **Plaintiff,**

                      **v.**

TIME, INC., TIME INC. HOME ENTERTAINMENT,
ANDERSON NEWS CORPORATION, PROLOGIX
THE NEWS GROUP, HUDSON NEWS COMPANY,
SOURCE INTERLINK COMPANIES, INC., d/b/a
Chas. Levy Circulating Company, BARNES &
NOBLE, INC., BORDERS, INC.,
BOOKS-A-MILLION, INC., WAL-MART STORES,
INC., TARGET CORPORATION,
KMART CORPORATION,
THE KROGER CO., SUPERVALU, INC.,
SAFEWAY, INC., PUBLIX SUPER MARKETS, INC.,
AHOLD USA, INC., DELHAIZE AMERICA, INC.,
7-ELEVEN, INC., H.E. BUTT GROCERY CO.,
MEIJER, INC., THE GREAT ATLANTIC &
PACIFIC TEA COMPANY, INC., DOLLAR
GENERAL CORPORATION., GIANT EAGLE, INC.,
WHOLE FOODS MARKET, INC., WINN-DIXIE
STORES, INC., TRADER JOE'S COMPANY, INC.,
and ALDI, INC.,

                       **Defendants.**

-------------------------------------------------------x

**ECF CASE**

Index No.

**COMPLAINT**

(Jury Demand)

1

Plaintiff, Debbie Slatzer ("Slatzer" or the "Plaintiff") brings this action against the Defendants captioned above (the "Defendants"), for damages and other relief, and alleges as follows:

## I. **Jurisdiction**

1.      Subject-matter jurisdiction is vested in this Court pursuant to the Copyright Act, specifically 17 U.S.C. §§ 101, et seq. and pursuant to 28 U.S.C. §§ 1338(a) and §1331.

2.      Personal jurisdiction of this Court over the Defendants exists in that each of the Defendants regularly conducts or transacts business within the Southern District of New York, and that part of the alleged activities of the Defendants occurred within this District, including purchase of the infringing works.

3.      The Court has supplemental jurisdiction over the Plaintiff's claims arising under state law pursuant to 28 U.S.C. § 1367(a).

## II. **Venue**

4.      Venue in this District is based on 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District; and Time, Inc., publisher of the works at issue, has its principal place of business in this District, and upon information and belief sold and delivered the works at issue to each of the other Defendants from this District.

### III.  <u>Plaintiff</u>

5.     Plaintiff, **DEBORAH SLATZER** ("Slatzer" or the "Plaintiff"),
resides in Glendale, California 91204, and is the widow and heir of Robert F. Slatzer
("Robert Slatzer", who died, during 2005, at the age of 77.  Plaintiff married Robert
Slatzer on March 22, 2005.

6.     Robert Slatzer, a public relations employee of a Hollywood studio,
met and married Marilyn Monroe ("Monroe" or "Marilyn Monroe") and, due to
studio pressure, he and Monroe obtained an annulment of the marriage.  This was
Monroe's first marriage. She and Robert Slatzer remained friends until Monroe's
death on August 5, 1962.  Robert Slatzer was with Monroe (and shooting pictures of
her) while Monroe was shooting the movie "Niagara" (in 1952) and Monroe's last,
unfinished movie "Something's Got to Give" (in 1962).

7.     Robert Slatzer wrote various books including THE LIFE AND
CURIOUS DEATH OF MARILYN MONROE, copyright 1974 by Robert F. Slatzer
and published by Pinnacle Books, Inc. (the "Curious Death Book") and THE
MARILYN FILES, copyright 1992 by Robert F. Slatzer and published in 1992 by
S.P.I. Books, a division of Shapolsky Publishers, Inc. (the "Marilyn Files Book").

8.     The Curious Death Book and the Marilyn Files Book contained
various pictures of Monroe used without permission by Time in its two works

"Remembering Marilyn" published during 2009 as to which the Plaintiff is the owner of the copyrights.

## IV.  Defendants

9.     Defendant, **TIME, INC.** ("Time" or the "Publisher"), a New York corporation, has its headquarters and principal place of business at 1271 Avenue of the Americas, New York, New York 10020.

10.    Time is the publisher of the Life Magazine "special edition" of REMEMBERING MARILYN (the "Marilyn Magazine"), with the initial publication date of June 1, 2009, coinciding with Monroe's 83rd birthday, followed by the hard cover edition of REMEMBERING MARILYN (the "Marilyn Book"), with the initial publication date on or about October 13, 2009.

11.    Upon information and belief, millions of copies of the Marilyn Magazine and Marilyn Book were published by Time and sold for the most part to the other defendants in this action, who resold them to resellers or to the public.

12.    Upon information and belief, sales of the two works continue to this date.

13.    Defendant, **TIME INC. HOME ENTERTAINMENT** ("Time Home") is an unincorporated division of Time or an incorporated subsidiary of Time, directly or indirectly, with its principal place of business at 1271 Avenue of the

Americas, New York, New York 10020.  Time and Time Home are hereinafter referred to as the "**Time Defendants**".

14.   Publication and distribution of the Marilyn Magazine and Marilyn Book occurred through Time Home and/or the Time Defendants.

15.   Defendant, **ANDERSON NEWS CORPORATION** ("Anderson") has its principal place of business at 6016 Brookvale Lane, Suite 151, Knoxville, Tennessee 37919.

16.   Anderson is or was the nation's largest wholesaler of magazines and purchased copies of the Marilyn Magazine and the Marilyn Book for resale by Anderson throughout the United States.

17.   Defendant, **PROLOGIX THE NEWS GROUP** ("News Group"), a Canadian organization, has its principal place of business for the Eastern Region of the United States at 5169 Southridge Parkway, Atlanta, Georgia 30349.

18.   News Group is or was one of the nation's four largest wholesalers of magazines and purchased copies of the Marilyn Magazine and the Marilyn Book for resale by News Group throughout the United States.

19.   Defendant, **HUDSON NEWS COMPANY** ("Hudson"),a New Jersey corporation, incorporated originally under the name Hudson County News Company, has its principal place of business at Attn: Jay G. Marshall, One Meadowlands Plaza – Suite 902, East Rutherford, NJ 07073.

20.    Hudson is qualified to do business in New York with the following resident agent for service of process: c/o C T Corporation System, 111 Eighth Avenue, New York NY 10011.

21.    Hudson is or was one of the nation's four largest wholesalers of magazines and purchased copies of the Marilyn Magazine and Marilyn Book for resale by Hudson (and its WH Smith stores) throughout the United States.  Hudson through its own Hudson stores and its acquired WH Smith PLC bookstores is the fourth largest book retailer in the United States.

22.    Defendant, **SOURCE INTERLINK COMPANIES, INC.**, d/b/a Chas. Levy Circulating Co. and/or Chas. Levy Circulating Co. of Chicago (hereinafter, "Source"), a Delaware corporation, has its principal place of business at 27500 Riverview Center Blvd., Bonita Springs, Florida 34134.

23.    Source is qualified to do business in New York, with service of process upon the New York Secretary of State to be forwarded to: Source Interlink Companies, Inc., 27500 Riverview Center Blvd., Bonita Springs, Florida 34134.

24.    Source is or was one of the nation's four largest wholesalers of magazines and (under the name Chas. Levy Circulating Co.) purchased copies of the Marilyn Magazine and Marilyn Book for resale by Source throughout the United States.

25.     Defendant, **BARNES & NOBLE, INC. ("B&N")** is a Delaware corporation with its principal place of business at 122 Fifth Avenue, New York, NY 10011-5602.  B&N is qualified to do business in New York.

26.     B&N has the following registered agent for service of process in New York:  Capitol Services, Inc., 1218 Central Avenue – Suite 1100, Albany, NY 12205.

27.     B&N is the nation's largest bookstore chain and purchased copies of the Marilyn Magazine and Marilyn Book for resale by B&N in its bookstores throughout the United States.

28.     Defendant, **BORDERS, INC.** ("Borders") is a Colorado corporation with its principal place of business at 100 Phoenix Drive, Ann Arbor, Michigan 48108.

29.     Borders is qualified to do business in New York, and has the following registered agent for service of process in New York:  C T Corporation System, 111 Eighth Avenue, New York NY 10011.

30.     Borders is the nation's second largest bookstore chain and purchased copies of the Marilyn Magazine and Marilyn Book for resale by Borders in its bookstores throughout the United States.

31.     Defendant, **BOOKS-A-MILLION, INC.** ("BAM") is a Delaware corporation with its principal place of business at 402 Industrial Lane, Birmingham, Alabama 35211.

32.   BAM is the nation's third largest bookstore chain and purchased copies of the Marilyn Magazine and Marilyn Book for resale by Borders in its bookstores located in 19 states of the United States.

33.   Defendant, **WAL-MART STORES, INC.** ("Wal-Mart") is a Delaware corporation with its principal place of business at 702 SW 8th Street. Bentonville, Arkansas 72716-8611.

34.   Wal-Mart is the largest retailer in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale by it in its retail stores located throughout the United States.

35.   Defendant, **TARGET CORPORATION** ("Target") is a Minnesota corporation with its principal place of business at 1000 Nicollet Mall, TPN-0945, Minneapolis, Minnesota 55403.

36.   Target is the second largest discount retailer in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail stores located throughout the United States.

37.   Defendant, **KMART CORPORATION** ("Kmart") is (upon information and belief) a Delaware corporation with its principal place of business at 3100 W. Big Beaver Road, Troy, Michigan 48084.

38.   Kmart is the third largest discount retailer in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its 1,327 stores located in 49 states.

39.   Defendant, **THE KROGER CO.** ("Kroger") is an Ohio corporation with its principal place of business at 1014 Vine Street Cincinnati, Ohio 45202-1100.

40.   Kroger is one of the 25 largest food retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail grocery stores located throughout the United States.

41.   Defendant, **SUPERVALU, INC.** ("SuperValu") is a Delaware corporation with its principal place of business at 11840 Valley View Road, Eden Prairie, Minnesota 55344.

42.   SuperValu is one of the 25 largest food retailers, and also a food wholesaler, in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail grocery stores located throughout the United States and through its wholesale distribution system.

43.   Defendant, **SAFEWAY, INC.** ("Safeway") is a Delaware corporation with its principal place of business at 5918 Stoneridge Mall Road, Pleasanton, California 94588.

44.    Safeway is one of the 25 largest food retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail grocery stores located throughout the United States.

45.    Defendant, **PUBLIX SUPER MARKETS, INC.** ("Publix") is a Florida corporation with its principal place of business at 3300 Publix Corporate Parkway, Lakeland, Florida 33811.

46.    Publix is one of the 25 largest food retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail grocery stores located throughout the United States.

47.    Defendant, **AHOLD USA, INC.** ("Ahold") is a Maryland corporation with its principal place of business in the United States at Ahold USA, Inc., Legal Department, 6300 Sheriff Road, Landover, Maryland 20785-4303.

48.    Ahold is qualified to do business in New York, with service of process upon the New York Secretary of State to be forwarded to: Ahold USA, Inc., 8301 Professional Place – Suite 115, Landover, Maryland 20785-2237.

49.    Ahold is one of the 25 largest food retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail grocery stores located throughout the United States.

50.   Defendant, **DELHAIZE AMERICA, INC.** ("Delhaize") is a corporation with its principal place of business at 2110 Executive Drive, Salisbury, NC 28147-9007.

51.   Delhaize is one of the 25 largest food retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail grocery stores located throughout the United States.

52.   Defendant, **7-ELEVEN, INC.** ("7-Eleven") is a Texas corporation with its principal place of business at One Arts Plaza 1722 Routh St. - Suite 1000. Dallas, Texas 75201.

53.   7-Eleven is the world's largest convenience retail chain in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its company-owned retail stores located throughout the United States.

54.   Defendant, **H.E. BUTT GROCERY CO.** ("HEButt") is (upon information and belief) a Texas corporation with its principal place of business at 646 S. Main Avenue, San Antonio, Texas 78204.

55.   HEButt is one of the 25 largest retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail grocery stores located mainly in Texas and for its retail stores in Mexico.

56.   Defendant, **MEIJER, INC.** ("Meijer") is (upon information and belief) a Delaware corporation with its principal place of business at 2929 Walker Ave. NW Grand Rapids, Michigan 49544.

57.   Meijer is one of the 25 largest retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail grocery stores and supercenters located throughout the United States.

58.   Defendant, **THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.** ("A&P") is a Maryland corporation with its principal place of business at 2 Paragon Drive, Montvale, NJ  07645-1718.

59.   A&P is qualified to do business in New York and has the following registered agent for service of process: Blumberg Excelsior Corporate Services, Inc., 62 White Street, New York, NY 10013.

60.   A&P is one of the 25 largest retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail stores located throughout its grocery stores located in Connecticut, Massachusetts, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, and the District of Columbia.

61.   Defendant, **DOLLAR GENERAL CORPORATION** ("Dollar") is an entity owned by investors who acquired the retailer or its assets in 2007, with its principal place of business at 100 Mission Ridge, Goodlettsville, TN 37072.

62.    Dollar is one of the 25 largest retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its 8,414 discount retail stores located throughout the United States.

63.    Defendant, **GIANT EAGLE, INC.** ("Giant") is (upon information and belief) a Pennsylvania corporation with its principal place of business at 101 Kappa Drive, Pittsburgh, Pennsylvania 15238-2809.

64.    Giant is the 49th largest retailer in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its 200 retail stores located in Western Pennsylvania, Central and Northern Ohio, Northern West Virginia and Western Maryland.

65.    Defendant, **WHOLE FOODS MARKET, INC.** ("Whole Foods") is a Delaware corporation with its principal place of business at 550 Bowie Street, Austin, Texas 78703-4644.

66.    Whole Foods is qualified to do business in New York under the name Whole Foods Market Group, Inc., with the following registered agent:  C T Corporation System, 111 Eighth Avenue, New York, New York 10011.

67.    Whole Foods is one of the 25 largest retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail stores located throughout the United States.

68.   Defendant, **WINN-DIXIE STORES, INC.** ("Winn-Dixie") is a Florida corporation with its principal place of business at 5050 Edgewood Court, Jacksonville, Florida 32254.

69.   Winn-Dixie is one of the 25 largest retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its 520 retail stores located in five states in the southeastern United States.

70.   Defendant, **TRADER JOE'S COMPANY, INC.** ("Trader Joe's") is (upon information and belief) a California corporation with its principal place of business at 800 S. Shamrock Avenue, Monrovia, California 91016.

71.   Trader Joe's is one of the 25 largest retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its retail stores located in the United States.

72.   Defendant, **ALDI, INC.** ("Aldi") is (upon information and belief) a Delaware corporation with its principal place of business at 1200 N. Kirk Road, Batavia, Illinois 60510-1443.

73.   Aldi is one of the 25 largest retailers in the United States and purchased copies of the Marilyn Magazine and Marilyn Book for resale in its more than 1,000 retail stores in 29 states, from Kansas to the East Coast.

### V.  **Marilyn Monroe Photographs, Copyrights and Ownership**

74.   During 1952, while on location in Buffalo, New York for the shooting of the film "Niagara", Robert Slatzer shot or directed the shooting of various photographs of himself together with Marilyn Monroe, including the photograph in which he is holding Marilyn Monroe in his arms (the "Photograph", with handwritten note by Marilyn Monroe, **Exhibit A** hereto).

75.   Robert Slatzer included the Photograph (with Marilyn Monroe's handwritten note "Bob – Luck and Love – Marilyn") in his Curious Death Book, published in 1974 by Pinnacle Books, Inc.

76.   The Curious Death Book, including the Photograph, was copyrighted in Robert Slatzer's name during 1974.  A copy of page iv from the Curious Death Book, stating "Copyright (c) 1974 by Robert F. Slatzer" is annexed hereto as **Exhibit B**.

77.   The Photograph without Marilyn Monroe's handwritten note was included in Robert Slatzer's Marilyn Files Book, published in 1992 by S.P.I. Books, a division of Shapolsky Publishers, Inc.

78.   The Marilyn Files Book, including the Photograph (without handwritten note), with copyrighted in Robert Slatzer's name during 1992.

79. Upon his death, Robert Slatzer bequeathed his copyrights to the Plaintiff by will, which copyrights also became her property as the widow and only legal heir of Robert Slatzer.

80. Plaintiff is the owner of the copyrights referred to in paragraphs 76 and 78 above.

81. At all times prior to his death, Robert Slatzer was a citizen of the United States and during the periods preceding publication of the two books (in 1974 and 1992, respectively) wrote the material and took or produced the photographs contained in his Curious Death Book and in his Marilyn Files Book.

82. The two books contained a large amount of material wholly original with Robert Slatzer and is copyrightable subject matter under the laws of the United States.

83. During the respective periods prior to publication of the two books, Robert Slatzer complied in all respects with the Copyright Act, and all other laws governing copyright, and secured the exclusive rights and privileges in and to the copyrights of said two books, and received from the Register of Copyrights two certificates of registration dated and identified as follows:

(i) Copyright registration number TX0005222590 issued June 7, 2000 to Robert F. Slatzer as to "The life and curious death of Marilyn Monroe / by Robert F.

Slatzer", for published or unpublished non-dramatic literary works. See **Exhibit C**; and

(ii) Copyright registration number TX0005225350 issued June 7, 2000 to Robert F. Slatzer as to "The Marilyn files / Robert F. Slatzer", for published or unpublished non-dramatic literary works.  See **Exhibit D**.

84.   During the period 1974 through approximately 1980 as to the Curious Death Book and 1992 through 1995 as to the Marilyn Files Book, the two books were published by Pinnacle Books, Inc. and S.P.I. Books, a division of Shapolsky Publishers, Inc. under authority or license by Robert Slatzer and all copies of the two books have been printed, bound, and published in strict conformity with the provisions of the Copyright Act and all other laws governing copyright.

85.   At all times on and after the Time defendants' initial publication of Remembering Marilyn Magazine and Remembering Marilyn Book, and during the period that the two works were being created by the Time Defendants, the Plaintiff has been the sole proprietor of all rights, title, and interest in and to the copyright in The Curious Death Book and the Marilyn Files Book.

86.   Although the Time defendants state (at page 78 of both works, top left corner) "COURTESY PINNACLE BOOKS", Pinnacle Books had no right to license the Time defendants to publish the Photograph in either of the two works.

Only the Plaintiff had the right to issue a license to publish the Photograph, which she did not do.

## VI.  Defendants' Infringing Activities

88.   Commencing on or about June 1, 2009 as to Remembering Marilyn Magazine and October 13, 2009 as to Remembering Marilyn Book, the Time Defendants infringed said copyrights by publishing and placing upon the market Remembering Marilyn Magazine and Remembering Marilyn Book, in which said defendants reproduced the Photograph (including the handwritten note by Marilyn Monroe).

88.   A copy of the Photograph (with the handwritten note by Marilyn Monroe) is annexed hereto as Exhibit A; and a copy of page 78 of the Time defendants' infringing Remembering Marilyn Magazine and Remembering Marilyn Book is hereto attached as **Exhibit E**, both of which contain a copy of the Photograph (at page 78).

89.   Commencing on or about June 1, 2009 as to Remembering Marilyn Magazine and October 13, 2009 as to Remembering Marilyn Book, and continuously since then, the Time Defendants, have been publishing, selling, distributing and otherwise marketing the Remembering Marilyn Magazine and Remembering Marilyn Book, and are thereby engaged in unfair trade practices and unfair competition against Plaintiff to Plaintiff's irreparable damage.

90.   Commencing on or about June 1, 2009 as to Remembering Marilyn Magazine and October 13, 2009 as to Remembering Marilyn Book, the other defendants (identified in paragraphs 15-73 above) and continuously since then, have been infringing the copyrights of the Plaintiff and have continued to infringe the copyrights, by selling, distributing and otherwise marketing the Remembering Marilyn Magazine and Remembering Marilyn Book, and are thereby engaged in unfair trade practices and unfair competition against Plaintiff to Plaintiff's irreparable damage.

## VI.  Damages and Statutory Damages

91.   The editorial slant of the two works, which had identical text and photographs in all material respects, was to capitalize upon a controversy created by several minor writers about Monroe in which they attempted to cast doubts on the validity of Robert Slatzer's claim that he had been married to Monroe for a brief period time, which marriage they annulled at the direction of Monroe's motion picture studio.

92.    The following passages in the works were written by the editors of
the works, Remembering Marilyn, to substantially advance and perpetuate the
controversy for maximizing the profits of the Time Defendants as well as the other
defendants:

a.    Starting at the work's "Introduction" (page 20, bottom left hand
corner) and dominating this first page of text in the work:

Let's look at her marriages, which together represent another
biographical item that you would think we would have a firm handle on
by now.  We know there were three:  The first was an affair either
strictly of convenience or at least somewhat of the heart, depending on
whom you believe; the second involved a baseball star; the third was to
an esteemed playwright. But some people say there was a fourth, and
even the most often cited biographies don't agree on this.

* * *

Our purpose in these pages is not to settle the matter; such an
effort would prove futile. We will in our text and captions present the
facts as they are known to be true and allude to the controversies as they
crop up.  We will be as accurate as possible.

b.    On page 48, the controversy is spelled out, as follows:

Some biographies claim Monroe was leading such a double life
during this period that she even managed a secret marriage, which to
this day cannot be proved.  In one version of events, a writer named
Robert Slatzer competed for her affection with DiMaggio in 1952, and
on October 4 he and Monroe, having had drinks at the Foreign Club in
Tijuana, Mexico, decided impulsively to wed.  They found a lawyer
who performed the ceremony, but once back in California, Monroe had

a change of heart, perhaps with some urging from Twentieth Century-Fox head Darryl F. Zanuck, and wanted out.  She and Slatzer went back to Mexico and paid off the lawyer to erase all evidence of the marriage. And what was that: a three-day union.  Is the story true?  Slatzer, who wrote two books about Monroe and died in 2005, always said it was. There's room enough for doubt, though, and the biographers are divided.

So behind the scenes such events may no may not have taken place, while before the flashbulbs, in the summer of 1953, the actress press her hand and high heels into wet cement outside Grauman's Chinese Theatre, no longer little Norma Jeane measuring herself against the imprints of others but Marilyn Monroe, living out the dream.

c.    On page 78, as an extended caption under the Photograph (Exhibit A)

showing Monroe posing for the photograph in the arms of Robert Slatzer, the editors

stated:

Was Monroe very briefly married to writer Bob Slatzer, seen with her at top during the filming of Niagara, in 1952?  It is one of the lingering mysteries of her minutely scrutinized life.  But she was definitely wed to baseball legend Joe DiMaggio on January 14, 1954, in the City by the Bar – and there's paper to prove it (above). * * *

93.    The Photograph and text about Monroe and her relationship with

Robert Slatzer was a substantial part of the works (Remembering Marilyn) and

entitled the Plaintiff to approximately 15% of the profits obtained by the Time

Defendants and other defendants from marketing, distribution and sale of the two

works.

94.    The cover price of The Marilyn Book is $17.95 and the cover price of

The Marilyn Magazine is $11.99 (which also had the following directions to

retailers: "DISPLAY UNTIL 10/23/09", a period of about 5 months from the date of publication).

95.   Under 17 U.S.C.A. § 504(c)(2), Plaintiff is entitled to an election of statutory damages in the amount up to but not exceeding $150,000 as to each of the two copyrights being infringed as to each willful infringer, to be decided by the trier of fact.

96.   The Time Defendants knew or should have known that they did not obtain any lawful permission from Pinnacle Books or any other person to publish the Photograph, and admitted knowing about Robert Slatzer's two books in which the Photograph was published (The Curious Death Book, with Monroe's handwritten note; and The Marilyn Files, without the Monroe note). Robert Slatzer's two copyrights were on file with the Copyright Office years prior to publication of the two infringing works.

97.   The Time Defendants, upon information and belief, are liable to the Plaintiff for willful infringement of the two copyrights or, alternatively, if the Time Defendants do not suspend distribution and recall all copies of the two works from the defendant retailers and wholesalers within 20 days after service of the summons and complaint herein, the Plaintiff will use such failure as evidence of willful infringement by the Time Defendants starting at the end of such 20-day period.

98.   Under 17 U.S.C.A. § 504(c)(1,2), Plaintiff is entitled to make an election of statutory damages as to non-willful infringers ("Innocent Infringers") in an amount no less than $200 or $750, or as much as $30,000, as to each Innocent Infringer, or as to a group of Innocent Infringers.

99.   Each of the defendants other than the Time Defendants is an Innocent Infringer, except to the extent it fails to stop selling the works within 20 days after service of the Summons and Complaint herein.

## PRAYER

**WHEREFORE**, Plaintiff demands:

1.   That each of the defendants, their respective agents, and servants be enjoined during the pendency of this action and permanently from infringing said copyrights of the Plaintiff in any manner, and from publishing, selling, distributing, marketing or otherwise disposing of any copies of the works entitled Remembering Marilyn (in both the magazine and book editions).

2.   That each of the defendants be required to pay to the Plaintiff such damages as the Plaintiff has sustained in consequence of the defendant's infringement of said copyrights and said unfair trade practices and unfair competition and to account for:

(a)  all gains, profits and advantages derived by the defendant by said trade practices and unfair competition; and

(b)  all gains, profits, and advantages derived by the defendant by its infringement of Plaintiff's copyrights or such damages as to the Court shall appear proper within the provisions of the copyright statutes, but not less than the applicable statutory damages, if the Plaintiff elects to receive statutory damages as to any defendant.

(c)  statutory damages in the amount of $150,000 per copyright as to the Time Defendants for willful infringement and as to each of the other defendants to the extent they become willful infringers through failure to stop selling or reselling the infringing works within 20 days after service of the summons and complaint on the defendant.

3.    That each defendant be required to deliver up to be impounded during the pendency of this action all copies of said book or magazine entitled "Remembering Marilyn" in its possession or under its control and to deliver up for destruction all infringing copies and all plates, molds, and other matter for making such infringing copies.

4.    That each defendant pay to the Plaintiff the costs of this action and reasonable attorney's fees to be allowed to the Plaintiff by the Court.

5.    That Plaintiff have such other and further relief as is just.

## JURY DEMAND

The Plaintiff hereby demands a jury trial of all issues triable of right by a

jury.

**Dated:  New York, New York**
**April 19, 2010**

**Respectfully submitted,**

_____

**Carl E. Person (CP 7637)**
*Attorney for the Plaintiff,*
   *Deborah Slatzer*
**325 W. 45th Street - Suite 201**
**New York, New York 10036-3803**
**Tel:   (212) 307-4444**
**Fax:  (212) 307-0247**
**email:  carlpers2@gmail.com**

# Exhibit A



*64.* MM and Robert Slatzer during the filming of *Niagara* (1952). *65.* Author Slatzer and Mrs. Eunice Murray in October of 1973, during one of the rare interviews granted by Mrs. Murray . . . eleven years after Marilyn's death.



vultures that supplied America with its crop of Hollywood news, were deliberately sadistic and vicious attempts to force her to submit.

Fox filed a $500,000 lawsuit against Marilyn. The studio had begun to crack down on not only its stars, but its producers and directors.

Walter Wanger, producer of *Cleopatra,* was taken off salary, though he volunteered to stay on at a lesser sum. Director Joseph Mankiewicz was told that he would be off salary in three weeks, whether *Cleopatra* was finished or not. *Cleopatra,* with costs exceeding $30 million, would have to gross at least $50 million to break even at the box office—a nearly impossible feat.

The blame could actually be placed on the studios, for at that time all the major stars were beginning to free-lance. The studios had either stopped trying to develop new talent or had failed to do so, and this made the established stars more in demand and therefore more powerful.

Though Marilyn was not without blame, there were numerous other factors—not all of them Marilyn's fault—that doomed *Something's Got to Give* to failure from the very beginning.

Confusion was rampant. Director Frank Tashlin was originally chosen. However, Marilyn had directorial approval in her contract, and Tashlin's name was not on the list of acceptable directors that Marilyn had submitted to the studio. He was let go, and George Cukor was hired to replace him. David Brown was set to produce the film but was replaced by Henry T. Weinstein.

However, the principal source of confusion was the script. Fox obtained the rights, then had it rewritten a number of times. Arnold Shulman wrote the original. Then Nunnally Johnson rewrote it. Johnson was living in Mexico at the time to avoid paying taxes and the geographical distance certainly couldn't have helped communications. Marilyn liked Johnson's rewrite better than any of the scripts that were to follow, for Johnson was one of her favorite people and she had leaned very heavily on him at various times in her career. But Johnson's version was rejected, and Walter Bernstein

217

# Exhibit B



The complete $8.95 bestseller with 100 pages of photographs and documents

"On the basis of the hard evidence Robert Slatzer has collected, I think it would now be more difficult to prove Marilyn Monroe took her own life than that she was killed" —Norman Mailer

# The Life and Curious Death of
# MARILYN MONROE
## by Robert F. Slatzer

Special thanks and acknowledgments to Gene Quattrara of UPI's Compix division and Steve Philips of AP's Wide World Photos. The following credits and caption numbers serve to identify the photographs in the picture section: UPI/Compix, 4, 7, 31, 34, 37, 44, 45, 48, 54, 57, 58, 59, 60, 61, 62, 63; courtesy of Wide World Photos, Inc., 6, 8, 9, 10, 24, 26, 29, 32, 33, 42, 43, 47, 49, 50, 51; courtesy of Twentieth Century-Fox Film Corporation, 5, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 36, 38, 39, 40, 41; courtesy of Globe Photos, Inc., 25, 27, 28, 35, 46, 52; from the collection of Robert F. Slatzer, 1, 2, 64, back cover; courtesy of Cathie Le Noir, 3; courtesy of Columbia Pictures, 30; courtesy of Eric Skipsey of Hollywood, 53; courtesy of Allan "Whitey" Snyder, 55; courtesy of Walter Zachrich, 56; courtesy of Wilson S. Hong, 65.

THE LIFE & CURIOUS DEATH OF MARILYN MONROE

*Copyright © 1974 by Robert F. Slatzer*

All rights reserved, including the right to reproduce this book or portions thereof in any form.

A Pinnacle Books edition, formerly published by Pinnacle House.

ISBN: 0-523-40-090-4

First printing, March 1975
Second printing, August 1977
Third printing, September 1979

Cover illustration by Lou Marchetti

*Printed in the United States of America*

PINNACLE BOOKS, INC.
2029 Century Park East
Los Angeles, California 90067

To Marilyn . . .
I've told it,
not the way they think it was,
or the way they heard it was,
or the way they wish it was,
but the way it really was . . .
the only way you'd want it told.

v

# Exhibit C



**Copyright**
United States Copyright Office

| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = slatzer, robert f.
Search Results: Displaying 7 of 10 entries



◀ previous    next ▶

Labeled View

*The life and curious death of Marilyn Monroe / by Robert F. Slatzer.*

**Type of Work:** Text
**Registration Number / Date:** TX0005222590 / 2000-06-07
**Title:** The life and curious death of Marilyn Monroe / by Robert F. Slatzer.
**Imprint:** New York : Pinnacle Books, c1974.
**Description:** 348 p.
**Notes:** Alternative deposit consists of cover, t.p., verso, 1st & last pages of text.
**Copyright Claimant:** Robert F. Slatzer, 1927-
**Date of Creation:** 1974
**Date of Publication:** 15May74
**Copyright Note:** C.O. correspondence.
**Names:** Slatzer, Robert F., 1927-



◀ previous    next ▶

| Save, Print and Email (Help Page) |
|---|
| Select Download Format   Full Record ▾   Format for Print/Save |
| Enter your email address: _____   Email |

---

Help   Search   History   Titles   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

# Exhibit D



**Help**    **Search**    **History**    **Titles**    **Start Over**

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = slatzer, robert f.
Search Results: Displaying 8 of 10 entries



Labeled View

*The Marilyn files / Robert F. Slatzer.*

**Type of Work:** Text
**Registration Number / Date:** TX0005225350 / 2000-06-07
**Title:** The Marilyn files / Robert F. Slatzer.
**Imprint:** New York : SPI Books, c1992.
**Description:** 314 p.
**Copyright Claimant:** Robert F. Slatzer, 1927-
**Date of Creation:** 1992
**Date of Publication:** 1992-07-10

**Names:** Slatzer, Robert F., 1927-





| Save, Print and Email (Help Page) |
| --- |
| Select Download Format   Full Record ▾   Format for Print/Save |
| Enter your email address:            Email |

Help   Search   History   Titles   Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

# Exhibit E

**LIFE**

*Remembering*
# Marilyn

INTRODUCTION

# Marilyn and Myth

The term *screen legend* has been applied to Marilyn Monroe perhaps more often than to any other star in the vast Hollywood firmament. That is proper, for *legend* implies a story not only larger than life but also in some ways unbelievable.

Chapters in her biography are certainly that. Even after the life story of Marilyn Monroe has been retold a thousand times, we are not absolutely sure which parts are precisely true and which are not, what really happened and what did not, what is fact and what is hyperbole or even fiction. Monroe willingly contributed to the legend herself; just as one example, she certainly pumped up the woebegone-orphan aspect of her childhood. And studio publicists were only too happy to heap on enough additional baloney to satisfy the hungriest lunchtime patrons at Schwab's. Some episodes that have clung stubbornly to the Marilyn Monroe narrative like so many barnacles are about as real as the color of her platinum blonde hair.

To look at the end of the tale here at the beginning, let's consider her death: At age 36 in 1962, Marilyn Monroe died in what the coroner ruled was a "probable" suicide. Many of her fans insist it was an accidental drug overdose, while many others hold that it was murder, and a subset is sure the Kennedys were involved. They say there are tape recordings, made by the FBI or a private detective hired by someone else, that prove this.

Let's look at her marriages, which together represent another biographical item that you would think we would have a firm handle on by now. We know there were three: The first was an affair either strictly of convenience or at least somewhat of the heart, depending on whom you believe; the second involved a baseball star; the third was to an esteemed playwright. But some people say there was a fourth, and even the most often cited biographies don't agree on this.

Some film fans think that biographer Anthony Summers came closest to the true Marilyn. Some side with Donald Spoto, some with Barbara Leaming, some with Fred Lawrence Guiles. Some say that Norman Mailer captured her best in his impressionistic rendering.

Our purpose in these pages is not to settle the matter; such an effort would prove futile. We will in our text and captions present the facts as they are known to be true and allude to the controversies as they crop up. We will be as accurate as possible.

More important, in keeping with LIFE's tradition and mission, we will present a beguiling and intimate photographic biography of this singular, beautiful, spirited, unfailingly generous and endlessly compelling movie star. We are, in one way, in a fortunate position: Although people sometimes lie, pictures don't. In these pages, Norma Jeane Mortensen Baker (Marilyn) Monroe, as she lived her life day to day from infancy until death, is reborn. As you gaze at these pictures and look into Marilyn's eyes, you are seeing her—the happiness, the sadness, the joy, the sorrow. You are reliving a life and spending time with the very real woman beyond the myth.

SAM SHAW/RGT

$1 million price tag. "You hire a legend and it's going to cost you dough."

Said Jack Cole, a dance instructor who worked with Monroe: "She is always looking for more time—a hem out of line, a mussed hair, a scene to discuss, anything to stall facing the specter, the terrible thing of doing something for which she feels inadequate . . .

"She wants to do it like it's never been done before."

She once said: "I used to get the feeling, and sometimes I still get it, that sometimes I was fooling somebody. I don't know who or what—maybe myself."

In a variation on that theme, she told *The New York Times* in July 1953, the month *Gentlemen Prefer Blondes* hit the theaters: "I feel as though it's all happening to someone right next to me. I'm close—I can feel it, I can hear it—but it isn't really me."

Who was she really, as she became this super-star? Apparently she didn't know, and certainly the public didn't. To her fans, she was the golden one, the beautiful girlfriend of Joltin' Joe DiMaggio, the screen goddess who somehow, with her wit and charm, was approachable. Who was *real*.

Some biographies claim Monroe was leading such a double life during this period that she even managed a secret marriage, which to this day cannot be proved. In one version of events, a writer named Robert Slatzer competed for her affection with DiMaggio in 1952, and on October 4 he and Monroe, having had drinks at the Foreign Club in Tijuana, Mexico, decided impulsively to wed. They found a lawyer who performed the ceremony, but

once back in California, Monroe had a change of heart, perhaps with some urging from Twentieth Century-Fox head Darryl F. Zanuck, and wanted out. She and Slatzer went back to Mexico and paid off the lawyer to erase all evidence of the marriage. And that was that: a three-day union. Is the story true? Slatzer, who wrote two books about Monroe and died in 2005, always said it was. There's room enough for doubt, though, and the biographers are divided.

So behind the scenes such events may or may not have taken place, while before the flashbulbs, in the summer of 1953, the actress



*Norma Jeane Baker could only dream of such things as international travel, but Norma Jeane DiMaggio (note signature!) needs a passport—not least because she is soon to honeymoon in Japan.*

pressed her hands and high heels into wet cement outside Grauman's Chinese Theatre, no longer little Norma Jeane measuring herself against the imprints of others but Marilyn Monroe, living out the dream.

COURTESY PINNACLE BOOKS





*Was Monroe very briefly married to writer Bob Slatzer, seen with her at top during the filming of* Niagara, *in 1952? It is one of the lingering mysteries of her minutely scrutinized life. But she was definitely wed to baseball legend Joe DiMaggio on January 14, 1954, in the City by the Bay— and there's paper to prove it (above). At right, Monroe and Joltin' Joe hold hands as they depart City Hall after the wedding ceremony. She is clearly elated, while he seems already upset by the fuss. Though their official union would be brief, he would remain a part of her life—and would in fact make a late return as a key player—until her death.*



GEORGE ZENO COLLECTION